UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NATALIE O'CONNELL,                      :
                                        :
                       Plaintiff,       :          Civil Action. No._____
                                        :
          v.                            :          **COMPLAINT**
                                        :
BANK OF NEW YORK MELLON,                :
                                        :          **JURY TRIAL DEMAND**
                                        :
                       Defendant.       :
                                        :
-------------------------------------------------------------X

     Plaintiff, Natalie O'Connell, by her attorney, Lisa R. Lipman, Esq.,  complaining of

Defendant Bank of New York Mellon, as and for her Complaint, alleges as follows:

## NATURE OF THE ACTION

    1.  This is an action by Plaintiff Natalie O'Connell ("Plaintiff" or "O'Connell") against her

employer, Defendant Bank of New York Mellon ("Defendant" or "Bank" or "BNYM"), to

remedy discrimination and retaliation against her on the basis of sex in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended ("Title VII"); on the basis

of disability in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et*

*seq.*as amended ("ADA or "ADAAA"); and to remedy interference and retaliation pursuant to

the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.* Plaintiff brings

pendent state discrimination, retaliation and disability claims, pursuant to the New York State

Human Rights Law, (hereinafter "NYSHRL"), NY Exec. Law §290 *et seq.* and pendent city law

discrimination, retaliation and disability claims, pursuant to the New York City Human Rights

Law ("City Law"), Administrative Code of the City of New York ("NYC Admin. Code") § 8-107

et seq.

2.   Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, costs and attorneys' fees and/or expert fees against Defendant, pursuant to 42 U.S.C. §1981a, §1988(c), §12205; 29 U.S.C. §2617(a)(3), Exec. Law §290 *et seq*., and NYC Admin. Code") § 8-107 et seq.

## JURY DEMAND

3.   Plaintiff demands a trial by jury of all issues in this action.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction in this action brought under federal laws and is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345, and Title VII of the Civil Rights Act of 1964, as amended, 1990, 42 U.S.C. §2000e-5, and 42 U.S.C. §§ 12101 ("ADA").

5.   Plaintiff requests that this court exercise supplemental jurisdiction over Plaintiff's pendent claims for discrimination and retaliation under the NYSHRL, Exec. Law §§296(1)(a) and §297, and the City Law,  NYC Admin. Code § 8-107 et seq., pursuant to 28 U.S.C. § 1367(a) and (c) because the state and city law claims arise from a common nucleus of operative facts with the federal law claim.

6.   Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5 because the unlawful employment practices alleged have been committed in this district, Plaintiff worked (and continues to work) in this district and, upon information and belief, the employment records relevant to such practices are maintained and administered in this district.

7.   Plaintiff Natalie O'Connell ("Plaintiff" or "O'Connell") has been employed by Defendant Defendant Bank of New York Mellon ("Defendant" or "Bank" or "BNYM") at its New York City Office, 240 Greenwich Street, NY, NY 10286, since October 2018.

8.   Defendant Bank of New York Mellon ("Defendant" or "Bank" or "BNYM") maintains offices at 240 Greenwich Street, NY, NY 10286.

9.   At all relevant times, defendant BNYM has continuously operated as an employer as defined under Title VII, the New York State Human Rights Law, and has continuously had at least 15 employees.

10. All administrative prerequisites have been met as Plaintiff filed a Charge and Amended Charge of discrimination and retaliation based on Title VII and the ADA with the Equal Employment Opportunity Commission ("EEOC") against Defendant. The EEOC issued a Notice of Right to Sue Letter on June 1, 2021, and Plaintiff is filing this Complaint less than 90 days after receipt of same.

## FACTS

11. In October 2018, after BNYM had aggressively recruited her, O'Connell joined BNYM as Director, Senior Principal & Program Manager (an M-level position), in its Transformation & Program Management group ("T&PM") in the Bank's New York City office, 240 Greenwich Street, New York, NY 10286.

12. At the time of hire by Defendant, O'Connell had worked for major financial institutions and financial services vendors for more than 20 years, and had acquired considerable expertise in business development, product management, strategy and program execution in financial services, and had developed particular expertise in Securities and Fund Services, Reference Data, and AML/KYC (Anti-Money Laundering/Know Your Client).

13.  Throughout and despite the discrimination and retaliation to which she was subjected, O'Connell's performance throughout her employment has been consistently superior to

excellent. She has received consistent, positive praise for her work by the executive management stakeholders she supports as well as by senior level managers.

14. O'Connell was initially hired to support all programs for BNYM's Global Fund Accounting Services line of business, and worked on a Fund Reporting Program ("FR Program") within her area of expertise, and reported to Kathleen Colish ("Colish"), Executive Manager of T&PM's Accounting Services line of business vertical. The FR Program itself was headed up by Ann Fogarty ("Fogarty"), Global Head of Accounting Services, whose direct reports comprised its key stakeholders. Fogarty was so impressed by O'Connell's work that she recruited O'Connell to work for her on an Expense Automation Program ("EA Program"), which had experienced serious problems because it was late, over budget by multi-millions, and needed to be fixed; Fogarty told Colish that she needed someone like O'Connell who could "kick the vendor's ass."

15. In or about May 2019, Chris DeBrusk ("DeBrusk") joined BNYM as its new head of T&PM. DeBrusk immediately and publicly stated that he planned to bring in "his guys from his old consulting firm" as consultants and to replace current employees, and within three to four months, had hired over half a dozen of his male friends from his former firm, despite his lip service about "needing to cut costs."

16. On June 28, 2019, O'Connell gave a presentation to DeBrusk, attended by Colish and Ashley Thoma, the Program's Business Analyst, on the go-forward strategy for the EA Program (see supra ¶14), which had been floundering for more than two years prior to O'Connell's joining BNYM. Additionally, in preparing for the presentation, O'Connell had obtained agreement from both Colish, her manager, and from the EA Program's key stakeholders, as to the go-forward strategy to re-baseline and revamp the delivery of the program. O'Connell

structured her presentation around this agreed-upon go-forward strategy. Indeed, Colish had viewed O'Connell's presentation ahead of time and had expressly approved it.

17. At the June 28, 2019 Meeting, DeBrusk treated O'Connell worse and differently from how O'Connell had seen him treat male managers in previous meetings she had attended.

18. In this meeting, DeBrusk: publicly yelled in O'Connell's face (a few inches from her face) for a full 40 minutes, calling her presentation "useless" while shoving the presentation deck across the table at her, and threatening to cancel the program and fire the vendor (despite lacking authority to do so); refused to allow O'Connell to speak or explain the recommended actions to be initiated, with the approval of, and after consultation with, the program's key stakeholders and Colish, O'Connell's manager; and blamed O'Connell for problems with the program, even though those problems had emerged more than two years earlier, well before the beginning of O'Connell's employment at BNYM. By his conduct, DeBrusk insulted O'Connell in front of her manager (Colish) and in front of Thoma, her subordinate.

19. In the immediate aftermath of the June 28, 2019 Meeting, O'Connell sent DeBrusk an email expressing her concerns about his false accusations and his refusal to allow her to present essential information to the group regarding the EA Program, and, as well, reiterated her ethical concerns regarding the EA Program (concerns she had previously raised to Colish, and on which Colish had taken no action).

20. O'Connell further concluded that DeBrusk's abusive behavior and false accusations were part of his pattern of creating a hostile environment for Plaintiff on the basis of her gender and treating her differently because of her sex. This was substantiated by Tracy Callahan ("Callahan"), at the time Debrusk's Chief Administrative Officer for T&PM, who told O'Connell that he had observed that DeBrusk treated the women in T&PM differently and worse

than he treated the men, and that DeBrusk's direct female reports were telling Callahan of their abusive treatment from DeBrusk based on their sex. In June 2019, O'Connell was told, DeBrusk had harassed a senior manager until she broke down in tears in a meeting.

21. Still, in the immediate aftermath of this incident, and inasmuch as O'Connell had opposed DeBrusk at the meeting and followed up with him by email to further explain her opposition immediately thereafter, and inasmuch as Colish, her manager, witnessed DeBrusk's abusive conduct, O'Connell decided not to report DeBrusk's sex-based discriminatory treatment of her to BYNM's Ethics Office, for fear that DeBrusk might retaliate against her, and might even terminate her.

22. O'Connell's decision was based in part on conversations she had with other BNYM managers who expressed their concerns that DeBrusk would retaliate by terminating anyone who reported him. Notably, Colish, who had agreed with O'Connell and supported the plan, had simply remained silent during the meeting while DeBrusk screamed at and verbally assaulted O'Connell. In addition, Jon Young, another M-level manager who had a team reporting to him, had confirmed to O'Connell that it was generally feared that DeBrusk would retaliate, and even terminate people, if complaints were made about him.

23. Additionally, during June 2019, O'Connell injured her left hand. That injury was not healing, and made typing on her laptop excruciatingly painful. O'Connell therefore arranged to go out on short term disability ("STD"), beginning July 15, 2019, a date that was subsequently extended as deemed medically necessary by her physicians. (O'Connell was covered by a BNYM job protection policy as well as by STD; FMLA leave would become an option on October 1, 2019, once O'Connell reached her one-year anniversary of employment at BNYM.)

24. Prior to beginning her STD leave, Colish told O'Connell that DeBrusk "is not a fan" of hers and "wants [her] out," despite her "excellent" work. O'Connell understood that DeBrusk wanted her out both because she was a woman and based on her having opposed his discriminatory, sex-based treatment of her during the June 28, 2019 Meeting. O'Connell also understood that DeBrusk wanted her out based on her earlier email to him, in which O'Connell pointed out his false accusations and mistreatment of her.

25. Since her first day of work, O'Connell had occupied one of the assigned "permanent" desks on the 13th Floor East at 240 Greenwich Street. Many consultants and some employees occupying the open floor plan on the 13th Floor East were assigned to such "permanent" desks, which included a set of file drawers (complete with a key) for their personal effects and files, and a name plate. The 13th Floor East open floor plan also included temporary "hoteling" desks; those using a "hoteling" desk could be given a small locker for their personal items.

26. Within days of O'Connell beginning her STD leave, DeBrusk and/or Colish, acting at his direction, had O'Connell's personal effects and files packed up, and DeBrusk assigned O'Connell's desk to a new hired male who was assigned to report directly to him. Colleagues contacted O'Connell asking whether she had been terminated, which O'Connell took as further indication DeBrusk's intention to continue to discriminate and retaliate against her, and ultimately, to terminate her.

**Further Opposition and Protected Activity by O'Connell;**
**Continued Disability-Related Issues**

27. On or about August 19, 2019, partially in light of Colish's comments of DeBrusk's intentions after the June 28, 2019 Meeting (as well as his actions at that meeting), and in light of his actions immediately after O'Connell began her STD leave, as well as comments from others "in the know," O'Connell reported DeBrusk's treatment of her to the BNYM Ethics Office

("Ethics Office") as per Defendant's policy. O'Connell also alleged DeBrusk treated her in a hostile manner and as well as engaged in a pattern of mistreating female managers and favoring male colleagues and male new hires. She alleged that DeBrusk engaged in bullying, harassment, and verbal abuse even to the point of triggering breakdowns and tearfulness from female managers.

28. In fact, prior to her Ethics Office complaint, Callahan had corroborated that DeBrusk had mistreated female managers in O'Connell's group, and subjected them to abusive treatment, and that was different from how DeBrusk treated the men.

29. In response to O'Connell's allegations, the Ethics Office assigned Barbara Blyth ("Blyth"), Employee Relations, to investigate DeBrusk's discriminatory and retaliatory conduct toward O'Connell. The Ethics Office handled, inter alia, discrimination complaints. Per Defendant's policy, Victoria Schaly in BYNM's Human Resources contacted O'Connell, and, in consultation with O'Connell, agreed that Barbara Blyth would not further investigate until O'Connell returned to work.

30. O'Connell's hand was not healing properly, despite casting and physical therapy. Therefore, working through BNYM Human Resources, O'Connell's leave was extended, changing to STD leave running concurrently with her FMLA leave on or about October 1, 2019. During her leave, O'Connell was unexpectedly diagnosed with Type 2 Diabetes, informed BNYM Human Resources of same, and undertook medical care to lower and regulate her blood sugar levels.

31. O'Connell was approved for return-to-work restrictions for her hand (no-thumb typing, use of Dragon Speak with a headset, and short, frequent breaks) and an ADA accommodation for her diabetes (working remotely, taking short frequent breaks, allowing time for medical follow-

ups). Working from home was a matter with which BNYM had experience; in fact, BNYM had "based at home" employees, who were employees hired to work at home and who were almost never required to come into the office. The Business side of BNYM ("Business") permitted these "based at home" employees to print at home so that they could function and be productive. Therefore, when O'Connell was given the ADA accommodation to work remotely, the "based at home" employee treatment applied, and the Business permitted O'Connell to print at home; otherwise, there was no way she could accomplish her job duties, which would have rendered the "work remotely" accommodation meaningless.

32.  O'Connell returned on December 11, 2019 to her FR Program as planned; Colish instructed her to re-engage with the program's stakeholders on December 13, 2019. Colish also told O'Connell that the program was being expanded and was expected to run through 2022 although, for administrative reporting and annual budgeting processes, the program budget was considered "closed" for 2019 in the PPM reporting system while the budgets underwent the formal approval process for 2020; this is a common year-end practice regarding programs that are continuing into the next year.

**Adverse Actions Constituting Discrimination and Retaliation Based on
Sex and Disability, and an FMLA Violation**

33. To O'Connell's surprise, however, as she re-engaged with her stakeholders in December, they began asking her about a "meet and greet" being held by a Janine Harvey.

34. Only in this way did O'Connell learn that her prior FR Program position, an Accounting Services Program position, was being given to Janine Harvey. No one, neither Colish, DeBrusk nor anyone else with authority told her she was not being returned to her prior position, a decision that they had made and executed.

9

35. Although Colish told O'Connell (and maintained to the Ethics Office) that the job had ended, this was patently untrue, as O'Connell repeatedly told Colish; not only was the position given to Janine Harvey, but she continues in the position to date, a fact that O'Connell has reported multiple times to the Ethics Office.

36. Thereafter, Defendant promptly demoted O'Connell – twice – to positions which did not involve the same or substantially similar duties and responsibilities and which did not entail substantially equivalent skill, effort, responsibility and authority. With these demotions, Defendant retaliated against O'Connell in part because of her August 19, 2019 complaint of sex discrimination.

37. These retaliatory demotions followed: Colish first tried to place O'Connell in a position in a regulatory LIBOR program, not part of Accounting Services, and one which called for a J/K-level Business Analyst, which was several levels below her pre-FMLA leave, M-level Program Manager position. The LIBOR position not only called for someone with a different background but it in no way involved the same or substantially similar duties and responsibilities nor did it entail substantially equivalent skill, effort, responsibility and authority, issues that O'Connell reported to the Ethics Office.

38. Indeed, the Manager in charge of that position expressly told Colish that the position was not for someone with O'Connell's background and seniority, but was appropriate for a much more junior level Business Analyst. Colish told the Manager that she did not care about the junior level or skill fit in the role and that O'Connell would just have to deal with it or words to that effect.

39. On information and belief, Colish was acting at the behest of DeBrusk both as to replacing her with Janine Harvey and as to trying to place O'Connell in the LIBOR position.

40. Defendant added further insult to injury in directing a different demotion, when the LIBOR position was proven inappropriate: Rather than reinstating O'Connell to her pre-FMLA leave FR Program position, DeBrusk asked his direct reports at a staff meeting who would be willing to take O'Connell onto their team on a temporary basis. Tracy Callahan ("Callahan") volunteered. DeBrusk then questioned Callahan's willingness, noting that O'Connell "may not be here much longer" or words to that effect, and that he did not want Callahan to be negatively impacted by what DeBrusk thought – and hoped – would be a short additional period of employment for O'Connell. Callahan, who had previously had some contact with O'Connell, stated that he had work for her.

41. Thus, O'Connell was placed on Callahan's project, beginning January 2020. Callahan worked on CIBCM (Canadian Imperial Bank of Commerce Mellon) Custody conversions. Switching to Callahan's project meant that O'Connell was no longer working on Fund Reporting or Accounting Services programs, the area for which she had been hired, and in which she had developed some 20 years of expertise and experience.

42. Upon telling DeBrusk that O'Connell could work with him, Callahan initially told O'Connell that he had a Data Privacy Issue that he needed addressed, pending approval by the Head of Risk. O'Connell addressed the Data Privacy Issue and Callahan expressed that he was pleased with her work on it.

43. The next month, Callahan advised O'Connell, that he needed help on a Human Resources project, Project Aspen, explaining it was not as yet approved or funded, but that they could start working on it with the hope that it would be approved. In this position as a Project Manager, a position that was previously held by a more junior, lower L-level employee, O'Connell was

accountable to Callahan. Although Colish remained as O'Connell's manager, Colish's

knowledge of O'Connell's position was filtered through Callahan.

44. Placing O'Connell with Callahan was part of DeBrusk's effort to "get rid" of O'Connell,

in retaliation for O'Connell having reported DeBrusk's discriminatory and retaliatory treatment

of her to the BNYM Ethics Office.

45. O'Connell remained in the Project Manager position on Project Aspen until June 2021,

substantially longer than expected. During that time, O'Connell developed a strong working

professional relationship with Callahan, with whom she worked on a day-to-day basis, and her

performance remained excellent.

46. Nevertheless, the position, was fundamentally different – and of lesser responsibility –

than her pre FMLA-leave, Program Manager, M-level position simultaneously managing a

minimum of two programs for Fund Accounting Services, including the FR Program in that:

O'Connell had no ability to set program strategy; no management of a program team; no

development and presentation of recommendations to senior management but rather, could only

present status updates; did not manage Project Managers or Business Analysts; and indeed,

O'Connell had no ownership of anything. Callahan told her that she "did not need to know

anything in order to complete the work for this position" or words to that effect.

47. Fundamentally, this position, while leaving her salary, but not her bonus, intact, was a far

lesser position when compared to every other male M-level Program Manager. O'Connell was

clearly overqualified for the position. Compensation aside, the position was a clear demotion and

a professional setback, one that eliminated O'Connell's ability to further develop the very areas

of specialization for which she was recruited, and one that left her without a means to advance in

her career. She now had an administrative-type position, in "Custody," largely inputting and

comparing data in Microsoft Excel spreadsheets (and without any resources to help her with the large amount of typing). She now no longer performed Fund Services functions that she had completed (or worked on) her entire career. The position required presence in the office and regular travel to Canada, which were different from O'Connell's pre-return arrangements; however, these requirements became moot in light of the COVID-19 pandemic.

48. Notably, O'Connell's arrangements for ADA accommodation (working remotely, taking short, frequent breaks, and allowing for medical follow-ups) and return-to-work restrictions (no-thumb typing, use of Dragon Speak with a headset, and short, frequent breaks) were not compatible with the demands of this position, and were only intermittently and then, only partially, honored.

49. Even though O'Connell was clearly overqualified for the position, she was unsurprisingly able to make the job into more than expected, garnering praise and respect from CIBCM's CEO, COO, and Chairman of the Board.

50. In short, DeBrusk, acting on his own and through Colish, used the fact of O'Connell's FMLA leave as an occasion to demote her and further discriminate and retaliate against her. The discrimination and retaliation left O'Connell in a far worse position, both now and for her future employment in this industry.

51. Ironically, in light of the COVID-19 pandemic, BNYM issued a policy stating that it would not fire any current employees (absent misconduct, which is not applicable to her work or conduct) during 2020. Whatever DeBrusk thought or imagined regarding O'Connell's "impending" departure was "off the table" in light of BNYM's policy not to fire anyone during 2020.

52. Nonetheless, DeBrusk had succeeded in derailing O'Connell, in that his conduct forced her into "Custody" when she had spent her entire career specializing in "Fund Services." Defendant then reduced O'Connell's overall compensation (bonus and salary) – resulting in her receipt in 2019 and 2020 of some $8,000/year less than O'Connell earned when she was first hired by BNYM.

53. BNYM followed its policy by not interviewing O'Connell about the Charges of discrimination and retaliation that she filed against DeBrusk shortly before her STD-which-converted-to-FMLA-leave until she returned from her FMLA leave. However, when the Ethics Office allegedly "investigated" those charges (after O'Connell returned to work), its investigation was fundamentally insufficient; for example, the Ethics Office refused to accept any documentation or proof O'Connell offered in support of her position. Not surprisingly, the Ethics Office concluded that there had been no discrimination or retaliation.

**Retaliation Continues and Increases**

54. As if twice demoting O'Connell were insufficient adverse actions, after it became clear at the beginning of May 2020, that O'Connell was not going to leave BNYM, the retaliation increased markedly, in ways that were surprising and disturbing:

55. Defendant repeatedly challenged O'Connell's access to Remote Printing, even after Defendant had formerly permitted her remote printing when she returned from her FMLA leave in December 2019. This was retaliation since Defendant routinely granted such access as "business approved remote printing" to "based at home" employees, some of whom were T&PM group employees.

56. Thus, when O'Connell returned from her FMLA leave in December 2019, she returned with "business approved remote printing," which was consistent with others in her T&PM group

who were primarily working remotely as "based at home employees." This did not require BNYM Human Resources approval. Nor was this "business approved remote printing" part of an ADA accommodation request, that is, an accommodation that is handled through BNYM Human Resources.

57. On or about May 6, 2020, in the midst of the COVID-19 shutdown, BNYM Human Resources told O'Connell for the first time, that she needed a "valid business rationale" for her "business approved remote printing," even though same had been provided and approved by the Business in December 2019. BNYM Human Resources was now requiring documents for employees who were now working remotely because of COVID-19. BNYM Human Resources told O'Connell she had to complete these COVID-19 related documents or lose access to remote printing. These new documents were impossible for O'Connell to complete and submit because they required information for which she had no answers: her need for remote printing had nothing to do with COVID-19. Indeed, Defendant's own Information Security Officer stated that there was nothing for O'Connell to submit for "business approved remote printing", thereby fundamentally disagreeing with BNYM Human Resources.

58. Undeterred, BNYM then told O'Connell that she was required to submit a new request for an ADA accommodation for remote work, and that her access to remote printing would be cancelled unless that ADA accommodation request included a request for remote printing that provided a "valid business rationale" for doing so. This made no sense and was retaliatory, since a "valid business rationale" had been provided and approved and, moreover, O'Connell's working remotely was like those T&PM employees who were "based at home" employees who with remote printing access that was clearly "business approved" access.

59. Moreover, BNYM Human Resources made this demand of O'Connell although neither her ADA accommodation nor her Return-to-Work Restrictions had included or required any application for remote printing, much less a "valid business rationale" for same. Nor was there any cogent explanation as to why her access to remote printing could no longer continue as part of the "business approved remote printing." On information and belief, others in T&PM who were working remotely and who also had "business approved remote printing" but who had not accused DeBrusk of discrimination and retaliation were not so treated.

60. By requiring O'Connell to provide additional information now in order to obtain printing access as an ADA accommodation, Defendant treated O'Connell differently and worse and required further disclosure of "disabilities" and further inquiries from Defendant's Human Resources. This was futile and discriminatory, since Defendant had already granted "business approved" access to all others working remotely as "based at home" employees and O'Connell's physicians had already ruled out any other possible accommodations other than access to remote printing and had already made same clear to BNYM Human Resources.

61. BNYM Human Resources thus turned the interactive process upside down – engaging in detailed interaction for two-and-one-half months of constant discussion of this important resource – and interfered with O'Connell's ability to timely complete her work. Defendant's Human Resources ultimately accepted the additional submission of medical justification in addition to what her doctors previously had explained, ultimately maintaining O'Connell's access to remote printing.

62. Shockingly, Defendant again required new certifications to justify remote printing access just before Labor Day weekend on September 4, 2020, telling O'Connell it would cut off her printing access that day, unless she immediately complied. Unable to reach Colish, her manager,

16

to have Colish address the issue with Defendant (Colish was on vacation), Later that day, Defendant cut off O'Connell's remote access to printing for approximately three weeks, which interfered with her ability to complete work, and again required her to spend many hours over a three-week period beginning on September 4, to resolve this situation. Given the extent to which her job duties required typing and printing, this unnecessary retaliation hobbled her ability to adequately perform all of her job duties during this approximately three-week period.

63. Other retaliation had occurred on or about May 28, 2020, when Colish, O'Connell's manager, accused O'Connell of not doing her work, not creating required project documents, and not attending meetings. Both O'Connell and Callahan, to whom O'Connell was accountable, corrected these accusations, explaining O'Connell's excellent work.

64. DeBrusk continued to explain to other managers his rationale for denying O'Connell development and progress opportunities, because of his belief that O'Connell's employment at BNYM would not continue:

65. In early May 2020, O'Connell asked to be nominated to be a mentor for more junior women in the financial services area, a service opportunity she had been recruited to do when she first joined BNYM. Others told O'Connell that, according to DeBrusk, it would be pointless because, come summer, O'Connell "would not be here."

66. Later in May 2020, O'Connell identified a gap in the FR Program she had worked on prior to her FMLA leave, and developed a proposal to remedy it. DeBrusk initially refused to meet to review the proposal and then, prior to the meeting, had Colish assign a different and inexperienced resource to manage the work identified by O'Connell's gap analysis. DeBrusk and Colish ignored O'Connell's substantial knowledge and ability to help that program, while

showing yet again that Defendant had never "closed" that program when it removed O'Connell from her prior position in the first place.

67. In July 2020, Colish determined that O'Connell's draft of a Master Deliverable Tracker ("MDT"), a document that had been approved a month earlier, would have to be re-done; however, rather than deal with O'Connell directly, Colish ignored O'Connell and merely relayed this information to Callahan, who, at that time, oversaw O'Connell's work on the project: Colish's treatment of O'Connell was worse treatment since all other M-level employees would review the MDTs with their overall managers, thereby gaining support, instruction, and professional development. Colish asked her other direct reports if they wanted to test out a new training application, but simply ignored O'Connell, and denied her that training opportunity.

68. O'Connell reported the foregoing additional discrimination and retaliation multiple times to her manager (Colish), and/or to Callahan, who oversaw her daily work, and/or to BNYM Human Resources, and/or to the Ethics Office (Kathleen Connelly, Barbara Blyth).

**Emotional Distress**

69. Immediately following the June 28, 2019 meeting in which Chris DeBrusk verbally assaulted O'Connell, O'Connell was so upset that she reported to BNY Mellon medical in the same building as: she was hyperventilating from uncontrolled crying and heart palpitations; could not catch her breath to speak; had elevated blood pressure; could not stop crying for over two hours; and was shaking. This was the beginning of severe distress and crying every day resulting from the ensuing years-long patterns of continual retaliation and harassment.

70. Other symptoms from the emotional distress were as follows: O'Connell was fearful after returning to the office. She worried about being in a room alone with DeBrusk. For weeks, she had panic attacks before going into the office. She cried every day, was unable to sleep in the

evenings as she replayed the events of June 28, 2019, and started relying on prescription medication to get to sleep. She was afraid to use any sick time or go on STD again when needed (and even when recommended by her doctor in May/June 2021) because she was afraid doing so would only exacerbate the retaliation and possibly be used as a pretext to terminate her employment.

71. In August or September, 2019, during a visit with her primary care physician, she was diagnosed as having depression and anxiety disorder and prescribed Lexapro because "in all the years [her physician's] known [O'Connell], she has never seen [O'Connell] unable to function." Her physician also suggested O'Connell see a therapist.  Another medical specialist confirmed those diagnoses, finding severe anxiety and depression.

72.  The severe anxiety showed itself through fear of leaving her apartment, terrified of possibly running into DeBrusk.  She also feared embarrassment from running into co-workers, and was unable to enjoy any daily outdoor activities. She worried about losing her job daily, cried and was wept throughout the day during the course of normal activities (i.e., grocery shopping) let alone any stressful or confrontational situations.  She was unable to get to sleep without medications, worried about her reputation at work and the embarrassment and humiliation caused by DeBrusk; and suffered loss of marital intimacy.

73. O'Connell repeatedly and unsuccessfully struggled to find a therapist for her emotional distress, repeatedly calling her Employee Assistance Program provider and confronting numerous obstacles, including scheduling conflicts and COVID-19 issues. Ultimately, O'Connell was forced to instead rely on medications, meditation and acupuncture, and support from family and friends and her medical physicians.

74. DeBrusk resigned on or about July 2020. He had succeeded, however, in derailing her career goals. As of July 6, 2021, O'Connell accepted and began a position in Third Party Governance, a better fit with her career path, but still a significantly different job in terms of responsibilities and required skills.

### FIRST CAUSE OF ACTION
### <u>(Discrimination Based on Sex in Violation of Title VII)</u>

75. Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

76. Defendant engaged in unlawful discrimination against Plaintiff on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended by discriminating against her in her employment and creating a hostile work environment on the basis of sex. Defendant's actions changed the terms and conditions of Plaintiff's employment for the worse, sufficient to be a tangible change, including her demotion and material changes of her job duties.

77. Defendant's actions were sufficiently severe or pervasive that they altered Plaintiff's working conditions and created an abusive and hostile work environment for her.

78. Moreover, as set forth herein above, Defendant failed and refused to take prompt and effective remedial action to stop the hostile environment in response to Plaintiff's numerous reports of discrimination and retaliatory harassment of her.

79. Additionally, such conduct was so overt that Defendant knew of should have known of the situation and remedied same.

80. Defendant acted with malice and/or reckless indifference to Plaintiff's Title VII protected rights.

81. As a consequence of Defendant's conduct, Plaintiff suffered significant ongoing emotion distress, including anxiety and depression.

82. As a consequence of its actions, Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, attorneys' fees, compensatory damages and damages for emotional harm, attorneys' fees, costs and disbursements in this action in an amount to be determined.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)

83. Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

84. Defendant engaged in unlawful retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, for her engaging in protected activity by reporting the discriminatory actions of DeBrusk. Defendant retaliated against Plaintiff and creating a retaliatory hostile work environment and adversely affecting the terms and conditions of her employment. Defendant's actions changed the terms and conditions of Plaintiff's employment for the worse, including but not limited to demoting her and changing her job duties, and engaging in further efforts to worsen her working conditions.

85. As such, Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, attorneys' fees, compensatory damages and damages for emotional harm, and punitive damages, attorneys' fees, costs and disbursements in this action in an amount to be determined.

## THIRD CAUSE OF ACTION
### (Discrimination Based on Disability in Violation of the ADA)

86. Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

87. Defendant through its actions including but not limited to repeatedly interfering with, and cutting off, Plaintiff's access to remote printing, requiring further unnecessary documentation concerning additional disabilities of Plaintiff, and failing to engage in an appropriate interactive

process regarding same, discriminated against Plaintiff because of her disability, and also denied her a reasonable accommodation.

88. Defendant through its management knew or should have known that its discrimination against plaintiff based upon her disability violated the ADA.

89. As a consequence of its actions Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, attorneys' fees, compensatory damages and damages for emotional harm, and punitive damages, attorneys' fees, costs and disbursements in this action in an amount to be determined.

## FOURTH CAUSE OF ACTION
### (Retaliation Based on the ADA)

90. Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

91. Defendant through its actions including but not limited to repeatedly interfering with, and cutting off, Plaintiff's access to remote printing, requiring further unnecessary documentation concerning additional disabilities of Plaintiff, and failing to engage in an appropriate interactive process regarding same, retaliated against Plaintiff because of her disability, were intentional practices of Defendant.

92. Defendant through its management knew or should have known that its retaliation against plaintiff violated the ADA.

93. As a consequence of its actions Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, attorneys' fees, compensatory damages and damages for emotional harm, and punitive damages, attorneys' fees, costs and disbursements in this action in an amount to be determined.

### FIFTH CAUSE OF ACTION
### (FMLA Violation and Interference Pursuant to 29 U.S.C. § 2615(a)(1)

94. Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

95. Plaintiff was an eligible employee under the FMLA as of October 1, 2019, when she had been employed by Defendant for one year and had worked more that 1250 in the preceding 12-month period.

96. Plaintiff exercised her rights when she took her FMLA leave.

97. Plaintiff was entitled, pursuant to the FMLA, to return to her position or to one that was identical or involve the same or substantially similar duties and responsibilities and which did not entail substantially equivalent skill, effort, responsibility and authority.

98. Defendant failed to return O'Connell to her pre-FMLA leave position, intentionally and falsely stating that it was "closed" or "ended."

99. Said position exists to date.

100. Defendant thereafter demoted O'Connell twice, first with its attempt to place her in the much lower LIBOR position, and then by placing her in an unfunded, unapproved position, where she remained for more than one and one-half years.

101. Such violates the substantive requirements of the FMLA and its requirement to return an employee to the same or substantially similar position. It also constitutes retaliation within the meaning of the FMLA, which prohibits an employer from "interfer[ing] with, restrain[ing] or deny[ing]" an employee the rights to which the employee is entitled. Interference is defined to include "discriminating against an employee … for having exercised … FMLA rights."

102. By reason of Defendant's violation of 29 U.S.C. §§ 2601 and FMLA § 2615(a)(1), and its willful actions toward Plaintiff, Plaintiff has incurred pecuniary and non-pecuniary losses.

103.  By reason of Defendant's violation of the FMLA, Defendant is liable to Plaintiff for any wages, salary, or other compensation denied or lost to Plaintiff by reason of the violation; together with an equal amount of liquidated damages and interest, attorneys' fees and costs in this action in an amount to be determined.

## SIXTH CAUSE OF ACTION
### (Discrimination and Retaliation in Violation of NYSHRL, Exec Law §§ 290 et seq.)

104.  Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

105.  Defendant engaged in unlawful discrimination and retaliation against Plaintiff, in violation of NYSHRL, NY Exec. L. §290 *et seq.,* and, more particularly, NY Exec. L. § 296.  It discriminated against Plaintiff on the basis of her sex, demoted her in retaliation for her complaints of discrimination, and created a retaliatory hostile work environment – substantially worsening the terms and conditions of Plaintiff's employment.

106.  As such, Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, compensatory damages and damages for emotional harm. For all conduct after October 1, 2019, Defendant is also liable to Plaintiff for punitive damages, attorneys' fees, costs and disbursements in this action in an amount to be determined.

## SEVENTH CAUSE OF ACTION
### (Discrimination and Retaliation in Violation of City Law, NYC Admin Code § 8-107 *et. seq.*,)

107.  Plaintiff repeats and re-alleges each allegation in each preceding paragraph of this Complaint as though fully set forth herein.

108.  Defendants engaged in unlawful discrimination and retaliation against Plaintiff on the basis of her gender and disability, in violation of the City Law, NYC Admin Code § 8-107 *et. seq.* It discriminated against Plaintiff on the basis of her sex, demoted her in retaliation for her

complaints of discrimination, and created a retaliatory hostile work environment,  substantially worsening the terms and conditions of Plaintiff's employment.

109.  Defendants are liable for the actions and inactions of each and every one of their agents and employees pursuant to NYC Admin. Code § 8-107(13).

110.  As such, Defendant harmed Plaintiff such that it is liable to her for backpay, lost benefits, compensatory damages and damages for emotional harm. Defendant is also liable to Plaintiff for punitive damages, attorneys' fees, costs and disbursements in this action in an amount to be determined.

111.  A copy of this complaint will be timely served upon the New York City Commission on Human Rights and the Corporation Counsel.

 **WHEREFORE** Plaintiff seeks judgment as follows:

a.  On the first, second, third and fourth causes of action, declaring that defendants engaged in unlawful discrimination and retaliation against Plaintiff on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, in on the basis of her disability in violation of the ADA,  42 U.S.C. §§ 12101 *et seq.*as amended, an award of statutory damages, including back pay and bonus ,compensatory damages for emotional harm and physical pain, and punitive damages, in an amount to be determined at trial; and including but not limited to injunctive relief, such as reinstatement to her prior position or front pay, attorneys' fees, costs and disbursements incurred in connection with this action; and

b.  On the fifth cause of action, awarding Plaintiff any wages, salary or other compensation denied or lost to Plaintiff by reason of the violation, together with an equal amount of liquidated damages and interest, attorneys' fees and costs in this action in an amount to be determined.;

    c.   On the sixth cause of action, declaring that defendants engaged in unlawful discrimination and retaliation against Plaintiff on the basis of her gender and disability, in violation of the NYSHRL, NY Exec. Law §290 *et seq*. and, more particularly, NY Exec. L. § 296 and awarding Plaintiff backpay, lost benefits, and compensatory damages for emotional harm, and costs and disbursements in this action and, in addition, for all conduct after October 1, 2019, punitive damages and attorneys' fees.

    d.   On the seventh cause of action, declaring that defendants engaged in unlawful discrimination and retaliation against Plaintiff on the basis of her gender and disability, in violation of the City Law, NYC Admin Code § 8-107 *et. seq.*, and more particularly NYC Admin. Code § 8-107(1), and awarding Plaintiff backpay, lost benefits, and compensatory damages for emotional harm, punitive damages, and attorneys' fees, and costs and disbursements in this action

    e.   On the first through fourth, and sixth through seventh causes of action, compensatory damages for personal, physical injury and past, present and future pain and suffering and emotional distress (collectively referred to as "Compensatory Damages") and punitive damages, the exact amount to be proven at trial, together with attorneys' fees, costs, and disbursements in cored in connection with this action; and in the maximum amounts permitted by law, together with full compensation for all past, present and future lost wages and benefits; and

    f.   For such other and further relief as this Court deems necessary and proper.

Dated: August 28, 2021
       New Rochelle, New York

                            Respectfully submitted,

                            _/s/ *Lisa R.Lipman*_____
                            Lisa R. Lipman, Esq
                            145 Huguenot Street, Ste. 402

New Rochelle, NY 10801
lisalipmanesq@gmail.com
T 914.644.8400
F 914.644.8414